IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CSB-SYSTEM INTERNATIONAL INC. : | |
| : | CIVIL ACTION |
| Plaintiff/Counterclaim Defendant, : | |
| : | |
| v. : | |
| : | NO. 10-2156 |
| SAP AMERICA, INC., : | |
| : | |
| Defendant/Counterclaim Plaintiff. : | |

**MEMORANDUM**

BUCKWALTER, S. J.                                                                                                April 30, 2012

Currently pending before the Court is Plaintiff SAP America, Inc.'s ("SAP") Motion for Summary Judgment to Limit CSB's Damages. For the following reasons, the Motion is granted in part as set forth in detail below.

**I.   STATEMENT OF FACTS**[1]

The patent involved in this case is U.S. Patent No. 5,631,953 ("the '953 Patent"), which claims a system or apparatus. (Def.'s Mot. Summ. J., Ex. 2 ("953 Patent").) In the simplest of terms, the technology in this case concerns circuit arrangements of hardware and software that allow the integration of speech (telephone systems) with data systems. These systems permit agents in customer service call centers to obtain information from their personal computer about

---

[1] Both the parties and the Court are well-aware of the operative facts in this case, as they have been set forth over the course of several prior opinions issued by the Court. In lieu of repeating those facts, the Court simply incorporates by reference the factual synopses included in those prior opinions. See CSB-Sys. Int'l v. SAP Am., Inc., No. Civ.A.10-2156, 2012 WL 1079986, at *15 (E.D. Pa. Apr. 2, 2012); CSB-Sys. Int'l v. SAP Am., Inc., No. Civ.A.10-2156, 2012 WL 1322894, at *15 (E.D. Pa. Apr. 17, 2012).

the person calling for assistance at the same time he or she takes the call. The U.S. application which led to the '953 patent was filed on August 25, 1995. The United States Patent & Trademark Office ("USPTO") allowed the claims as set forth in the '953 Patent. Ultimately the '953 patent issued on May 20, 1997.

The accused products are the SAPphone Interface and the Integrated Communication Interface ("ICI") (collectively the "Accused Products"). The SAPphone was first introduced to the market in 1998. Subsequently, SAP developed the ICI, the successor product to SAPphone, and began to market it in 2003.

Plaintiff CSB-System International, Inc. ("CSB") brought the present patent action against Defendant SAP in this Court on May 11, 2010, alleging that the Accused Products infringe on the '953 Patent held by Plaintiff. Due to the existence of several disputed claim terms, the parties proceeded to a one-day Markman hearing,[2] at which time each side offered a short tutorial and the testimony of an expert witness. Thereafter, on July 27, 2011, the Court issued a lengthy opinion construing each of the disputed claims, but declining to rule on SAP's claims of indefiniteness until the summary judgment stage.

On April 2, April 17, and April 25, 2012, the Court denied Defendants' Motions for Summary Judgment on Invalidity, Non-infringement, and No Willful Infringement, respectively. The Court now turns its attention to the present Motion for Partial Summary Judgment Limiting CSB's Claim for Damages.

## II.  STANDARD OF REVIEW ON SUMMARY JUDGMENT

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on

---

[2] See Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed. Cir. 1995).

file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A factual dispute is "material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party. Id.

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004). It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)). Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987). If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255.

Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims." Id. at 325. Once the movant has carried its initial burden, the opposing party "must do more than

simply show that there is some metaphysical doubt as to material facts." Matsushita Elec., 475 U.S. at 586. "[T]he non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Moreover, the mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue. Anderson, 477 U.S. at 249–50.

## III.   DISCUSSION

The present Motion concerns Plaintiff's claim for more than $280 million in damages based on software sales of the Accused Products dating back to 2001. Defendant argues that, assuming Plaintiff prevails on its infringement claims, Plaintiff's damage award is cabined by two well-established legal tenants: (1) lack of standing, and (2) the six-year limitation period of 35 U.S.C. § 286. Applying either one of these principles, Defendant concludes that Plaintiff has failed to put forward evidence of any active infringement by SAP occurring within the relevant time periods. The Court addresses each argument individually.

### A.   Standing

Defendant's first argument asserts that because Plaintiff was not assigned rights to the '953 Patent until March 29, 2010, Plaintiff lacks standing to sue for acts of infringement occurring prior to that time. "The doctrine of standing limits federal judicial power and has both

constitutional and prudential components." Media Techs. Licensing, LLC. v. Upper Deck Co., 334 F.3d 1366, 1369 (Fed. Cir. 2003). Constitutional standing requires a plaintiff to demonstrate that it suffered an injury-in-fact that is "'fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'" Teva Pharms. USA, Inc. v. Novartis Pharms. Corp., 482 F.3d 1330, 1337 (Fed. Cir. 2007) (quoting Allen v. Wright, 468 U.S. 737,751 (1984)).

In the patent context, "[t]he right of a patentee for a remedy to patent infringement is created by the statute." Rite-Hite Corp. v. Kelly Co., 56 F.3d 1538, 1551 (Fed. Cir. 1995) (citing 35 U.S.C. § 281).[3] As a general principle, a "patentee" is entitled to recover full compensation for any damages suffered as a result of the infringement. Gen. Motors Corp. v. Devex Corp., 461 U.S. 648, 654 (1983). The term "patentee" includes "'not only the patentee to whom the patent was issued but also the successors in title to the patentee.'" Ortho Pharm. Corp. v. Genetics Inst., Inc., 52 F.3d 026, 1030 (Fed. Cir. 1995) (quoting 35 U.S.C. § 100(d)). The "injury" present in patent infringement arises from the patentee's statutorily-created right to exclude. Morrow v. Microsoft Corp., 499 F.3d 1332, 1339 (Fed. Cir. 2007). In other words, "[c]onstitutional injury in fact occurs when a party performs at least one prohibited action with respect to the patented invention that violates these exclusionary rights." Id. Infringement thus harms only the owner of the patent at the time of the infringing acts. Minco, Inc. v. Combustion Eng'g, Inc., 95 F.3d 1109, 1117 (Fed. Cir. 1996) (citing United States v. Loughrey, 172 U.S. 206, 211–12 (1898)).

Given this principle, "only a party that possessed legal title to a patent at the time the

---

[3] "A patentee shall have remedy by civil action for infringement of his patent." 35 U.S.C. § 281.

infringement occurred can bring suit to recover damages for such infringement." Messagephone, Inc. v. SVI Sys., Inc., Nos. Civ.A.99-1471, 99-1478, 2000 WL 1141046, at *4 (Fed. Cir. Aug. 11, 2000). While a patentee may transfer title to a patent by assignment, making the assignee the effective "patentee" under 35 U.S.C. § 281, Prima Tek II, L.L.C. v. A-Roo Co., 222 F.3d 1372, 1377 (Fed. Cir. 2000), "'it is a great mistake to suppose that the assignment of a patent carries with it the right to damages for an infringement committed before such assignment.'" Messagephone, 2000 WL 1141046, at *4 (quoting Moore v. Marsh, 74 U.S. 515, 522 (1868)). Rather, the presumptive understanding is that "[t]he bare reference to all right, title, and interest does not normally transfer the right to sue for past infringement." Minco, 95 F.3d at 1117 (citing Moore, 74 U.S. at 520). Instead, "the right to sue for prior infringement is not transferred unless the assignment agreement manifests an intent to transfer this right."[4] Id.; Arachnid, Inc. v. Merit Indus., Inc., 939 F.2d 1574, 1579 n.7 (Fed. Cir. 1991) (noting that the sole exception is "where the assignment of a patent is coupled with an assignment of a right of action for past infringements"). Although no formula or set prescription of words is required, "[t]he authorities are uniform that the latter assignment must be express, and cannot be inferred from the assignment of the patent itself." Arachnid, 939 F.2d at 1578 n.7.

In the present case, Defendant does not dispute that Plaintiff has standing—as the current holder of the '953 Patent—to bring the present action. It argues, however, that CSB did not become the holder of that Patent until March 29, 2010, when CSB-System GmbH—Plaintiff's German sister company—executed a transfer of title that purported to "assign the entire US right,

---

[4] This comports with the general principle that "a patent is a bundle of rights which may be retained in whole or in part, divided and assigned." Morrow, 499 F.3d at 1341 n.8.

title and interest" in the '953 Patent to CSB. (Def.'s Mot. Summ. J., Ex. 3.) Given the absence of any language in this assignment conferring on Plaintiff the right to sue for past infringement, Defendant argues that CSB is limited to damages from SAP only for acts of infringement occurring *after* the March 29, 2010 date of assignment.

Plaintiff responds with the rather cursory argument that by failing to (a) set forth the law of the state or country which governs the assignment, and (b) analyze the Assignment in light of the proper state rules on interpretation, Defendant has failed to meet its burden on summary judgment. This argument, however, simply ignores the "elephant in the room" created by the obvious standing issues. Certainly, Plaintiff is correct that "[d]etermining whether the right to sue for prior infringement has been transferred turns on the proper construction of the assignment agreements, which is a matter of state contract law."[5] Minco, Inc. 95 F.3d at 1117; see also Euclid Chem. Co. v. Vector Corrosion Techs., Inc., 561 F.3d 1340, 1343 (Fed. Cir. 2009) ("Construction of patent assignment agreements is a matter of state contract law.") (quotations omitted). Plaintiff also accurately notes that Defendant fails to indicate which state law governs interpretation of the assignment at issue. What Plaintiff neglects to recognize, though, is that "whether one applies German or American law, the construction of a contract begins with the text. An unambiguous text with a 'plain meaning' cannot be altered by extrinsic evidence."

---

[5] To the extent that Defendant argues that this Court must apply federal law, its argument is mistaken. The case cited by Defendant states that, "the question of whether a patent assignment clause creates an automatic assignment or merely an obligation to assign[, however,] is intimately bound up with the question of standing in patent cases. We have accordingly treated it as a matter of federal law." DDB Techs., L.L.C. v. MLB Advanced Media, L.P., 517 F.3d 1284, 1290 (Fed. Cir. 2008). There is no question in this case, however, whether the assignment was a present or future assignment.

Gross v. German Found. Indus. Initiative, 499 F. Supp. 2d 606, 662 (D.N.J. 2007) (citing Am. Cyanamid Co. v. Fermenta Animal Health Co., 54 F.3d 177, 181–82 (3d Cir. 1995)), aff'd, 549 F.3d 605 (3d Cir. 2008).  "An unarticulated subjective intent by one of the contracting parties to depart from the text's generally accepted meaning is universally ignored, because in interpreting a contract, the primary objective of the court is to derive the objective intention of the parties at the time the contract was made."[6]  Id.

---

[6] Under Illinois law, contractual language will be interpreted according to its "'plain, ordinary and popular meaning.'"  Bourke v. Dun & Bradstreet Corp., 159 F.3d 1032, 1038 (7th Cir. 1998) (quoting O'Rourke v. Access Health, Inc., 688 N.E.2d 214, 220 (Ill. App. 1996)).  Likewise, under California law, a court must "look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it."  Perez-Encinas v. Amerus Life Ins. Co., 468 F. Supp. 2d 1127, 1133 (N.D. Cal. 2006); ViChip Corp. v. Lee, 438 F. Supp. 2d 1087, 1096 (N.D. Cal. 2006) ("As with the interpretation of any contract, the court must look to the plain meaning of the terms and provisions contained in the patent assignment form.") (citing MacKinnon v. Truck Ins. Exch., 73 P.3d 1205, 1213 (Cal. 2003)).  Interpretation of a written is assignment is a matter of law for the court even though questions of fact are involved.  Southland Corp. v. Emerald Oil Co., 789 F.2d 1441, 1443 (9th Cir. 1986).

Finally, as to German law, Plaintiff has offered no description or evidence on how contracts or patent assignments are construed, and has not suggested that German law relies on anything but the plain meaning of the contract.  Federal Rule of Civil Procedure 44.1 states that

> A party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing.  In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.  The court's determination must be treated as a ruling on a question of law.

Fed. R. Civ. P. 44.1.  Because a court is not required to engage in its own research as to foreign law and has the right to insist that the proponent of the foreign law present evidence on the question, this Court will not engage in an extensive analysis of German contract interpretation principles.  See Pfizer Inc. v. Elan Pharm. Research Corp., 812 F. Supp. 1352, 1360–61 (D. Del. 1993) (declining to consider German contract construction principles where party advocating their use failed to brief the issue).

In this case, the assignment is short and simple, stating:

WHEREAS, CSB-System Software-Entwicklung & Unternehmensberatung GmbH (hereinafter "CSB-System GmbH"), of 52511 Geilenkirchen, Germany is the owner of the entire interest in the invention disclosed and claimed in United States Patent No. 5,631,952, filed August 25, 1995 by virtue of an Assignment filed in the United States Patent & Trademark Office.  The assignment for the application has been recorded in the Patent and Trademark Office on August 25, 1995 at Reel 007790, Frame 0596.

WHEREAS, ***CSB-System GmbH hereby assigns the entire US right, title and interest in said invention disclosed and claimed in United States Patent No. 5,631,953, and in the patent itself to CSB-System International, Inc. USA*** (hereinafter "CSB-System USA") of 2535 Camino Del Rio, San Diego, California, 92108, USA; and

WHEREAS, there is no other assignment, sale or encumbrance entered into previously by the CSB-System GmbH which would in any manner affect this assignment;

NOW, THEREFORE, TO ALL WHOM IT MAY CONCERN: for good and valuable consideration, receipt of which is hereby acknowledged, CSB-System GmbH, does hereby sell, assign, transfer and set over unto CSB-System USA, its successors and assigns, all of CSB-System GmbH's right, title and interest in and to the invention disclosed and claimed in said United States patent and the patent itself, and any corresponding US patent applications, and any continuation or divisional patent applications, and any patents issuing from any of said continuation or divisional patent applications, and any patents issuing from any of said continuation or divisional patent applications, and any re-issues thereof.

(Def.'s Mot. Summ. J., Ex. 3 (emphasis added).)  Nothing in this language, given its plain and unambiguous meaning, suggests that it effected anything but a simple assignment of the present and future rights to the patent to CSB.  Plaintiff does not advance any other interpretation or suggest that an alternative reading is plausible from this language.  Moreover, despite intimating that either German, California, or Illinois law may apply to the interpretation of this assignment,

9

Plaintiff has made no attempt to show how an interpretation under these laws would differ from the plain meaning of the language itself. Accordingly, the Court will construe the assignment to mean precisely what it says—assignment of present and future rights in the '953 Patent.

Having done so, the Court is now constrained to find that this language is insufficient to confer standing upon CSB to sue for past infringement. As set forth above, "[t]he bare reference to all right, title, and interest does not normally transfer the right to sue for past infringement." Minco, 95 F.3d at 1117. Rather, the right to sue for past infringement "must be express, and cannot be inferred from an assignment of the patent itself." Arachnid, 939 F.2d at 1579 n.7. The present assignment contains no reference to any right to sue, let alone an express assignment of any right to sue for past infringement. Moreover, the assignment, by its plain language, only became effective as of March 29, 2010, the date it was signed.[7] Such language stands in sharp contrast to cases finding the right to sue for past infringement. See, e.g., State Contracting & Eng'g Corp. v. Condotte Am., Inc., 346 F.3d 1057, 1062 (Fed. Cir. 2003) (finding the following language to confer on assignee the right to sue for past infringement: "[i]t is understood that this assignment is inclusive of all claims against third parties for infringement, past and present; and,

---

[7] Nor could Plaintiff obtain a *nunc pro tunc* assignment of the right to sue for past infringement. As a general rule, a plaintiff must have standing to sue at the time the suit is brought and "*nunc pro tunc* assignments are not sufficient to confer retroactive standing." Enzo APA & Son, Inc. v. Geapag A.G., 134 F.3d 1090, 1093 (Fed. Cir. 1998). Even where the plaintiff has standing to bring suit—as the assignee of all rights to the patent—the failure to include the right to sue for past infringement in the original assignment may not be retroactively cured by a *nunc pro tunc* assignment of such rights. See Wacoh Co. v. Chrysler LLC, Nos. Civ.A.08-456, 08-691, 2009 WL 36666, at *8 (W.D. Wis. Jan. 7, 2009) ("Thus, Wacoh's standing to assert past infringement claims must be assessed independently of its standing to assert future infringement claims and Wacoh cannot use a *nunc pro tunc* assignment to repair its deficiencies in standing.").

that the recovery for infringement, if any, is and remains the property of the assignee"); Schreiber Foods, Inc. v. Beatrice Cheese, Inc., 402 F.3d 1198, 1202–03 (Fed. Cir. 2005) (finding standing where the assignment explicitly included an assignment of all causes of action). Thus, while Plaintiff unequivocally had standing to bring the instant lawsuit in May 2010, and has standing to seek damages for any infringement occurring from March 29, 2010 onward,[8] it has no standing to seek redress for infringement occurring prior to that date.

    **B.**     **35 U.S.C. § 286**

Having found that Plaintiff only has standing to sue for acts of infringement occurring from March 29, 2010 onward, the Court now briefly considers Defendant's contention that Plaintiff's entitlement to damages for infringement is also limited by Section 286 of the Patent Act.[9] This statute provides that "[e]xcept as otherwise provided by law, no recovery shall be had for any infringement committed more than six years prior to the filing of the complaint or counterclaim for infringement in the action." 35 U.S.C. § 286. This section is not a "statute of limitations" in that it does not defeat the right to bring suit. Standard Oil, Co. v. Nippon Shokubai Kagaku Kogyo Co., 754 F.2d 345, 348 (Fed. Cir. 1985). Rather, it was intended as a limitation on a damages claim and "merely limits the time frame for which damages can be

---

[8] Plaintiff's original expert report calculates damages from 2001 to 2010, when the lawsuit was filed. Notably, on November 4, 2011, Plaintiff's expert filed a supplemental report calculating damages for the time frame between April 2010 and December 2010, based on the understanding that CSB was not assigned the '953 Patent until March 29, 2010. (Pl.'s Mot. Summ. J., Ex. 6 at 16–18.)

[9] Although Plaintiff's ability to recover damages is already limited by the fact that it only has standing to sue for acts of infringement from March 29, 2010 onward, the Court, for purposes of comprehensiveness, nonetheless considers the Section 286 argument.

incurred." Bradford Co. v. Jefferson Smurfit Corp., No. Civ.A.00-1511, 2001 WL 35738792, at *9–10 (Fed. Cir. Oct. 31, 2001). Thus, "[a]ssuming a finding of liability, the effect of section 286 is to limit recovery to damages for infringing acts committed within six years of the date of the filing of the infringement action. One counts backwards from the date of the complaint to limit pre-filing damages arbitrarily." A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1030 (Fed. Cir. 1992).

Plaintiff does not appear to dispute that this six-year limitations period applies. As such, because CSB did not file its Complaint until May 11, 2010, it cannot recover damages for infringement occurring prior to May 11, 2004. Nonetheless, because CSB is more temporally restricted by its standing deficiencies, the Court need not further address the impact of this statute on the present case.

### C. Whether There Is Evidence of Infringement by SAP Within the Relevant Time Periods

In light of the foregoing, the onus now falls upon Plaintiff to establish that Defendant committed acts of infringement within the time period for which CSB can recover damages, *i.e.* from March 29, 2010 onward. Defendant argues that, although CSB may obtain relief for licenses SAP sold after the assignment date, it may not recover damages relating to licenses that SAP sold prior to the assignment date.

In response, Plaintiff argues that the claims of the '953 Patent are infringed "when the claimed circuit arrangement is made or used and *continue to be infringed and CSB suffer injury as long as the third-party [SAP's customer] continues to have the claimed circuit arrangement.*" (Pl.'s Resp. Opp'n Mot. Summ. J. 1 (emphasis in original).) In other words, Plaintiff claims that

because infringement by SAP's licensees is ongoing, it seeks to capture all such infringing activity regardless of the date of sale of the license for the SAPphone or ICI at issue. (Id. at 2.)

The United States Court of Appeals for the Federal Circuit has held that patent infringement is a "continuing tort" where "each act of infringement gives rise to a separate cause of action." Augustine Med., Inc. v. Progressive Dynamics, Inc., 194 F.3d 1367, 1371 (Fed. Cir. 1999). Because patent infringement is a continuing tort, "[t]he filing of a lawsuit does not stop the clock insofar as culpability may arise from continuing disregard of the legal rights of the patentee." Pall Corp. v. Micron Separations, Inc., 66 F.3d 1211, 1222 (Fed. Cir. 1995). This concept is essential since "[w]hoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). To establish inducement, a patent owner must show that the accused infringer induced the infringing acts and knew or should have known that its actions would induce actual infringement. DSU Med. Corp. v. JMS Co., 471 F.3d 1293, 1304 (Fed. Cir. 2006). It is not enough that the inducer merely had knowledge of the direct infringer's activities. Id. at 1306. Rather, there must be "evidence of culpable conduct direct to encouraging infringement" and "affirmative intent to cause the direct infringement." Id. Notably, "the patentee always has the burden to show direct infringement for each instance of indirect infringement." Id. at 1303.

Plaintiff now contends that, in the present case, the sale of the license by SAP to its customers is not the direct infringing activity for which it seeks to recover; rather, it is the setting up or use of the claimed circuit arrangement, which constitutes ongoing infringement "in such a way that it can be thought of as a series of infringements." (Pl.'s Resp. Opp'n Mot. Summ. J. 12.) Plaintiff's damage methodology thus recognizes that SAP customers who purchased the

13

Accused Products prior to March 29, 2010[10] have and still use the infringing circuit arrangement.[11]  It further contends that SAP has actively induced this continuing infringement—and thus committed indirect infringement—in two distinct ways.

First, Plaintiff asserts that "SAP's inducement in selling and setting-up its customers' direct infringement was the sole cause of the customers' continuous direct infringement. Without SAP's sale of SAPphone or ICI and its setting-up of the claimed circuit arrangement at its customers, *these customers would never have infringed the '953 patent and would not be continuing to infringe the '953 patent*." (Id. at 15–16 (emphasis in original).)  This argument, however, misunderstands the law regarding active inducement of infringement.  "Under 35 U.S.C. § 271(a), only an affirmative act (making, using, or selling the patented design) can give rise to the tort of direct infringement." Beverly Hills Fan Co. v. Royal Sovereign Corp., 21 F.3d 1558, 1570 n.25 (Fed. Cir. 1994).  Under § 271(b), a defendant may be held liable as an indirect

---

[10] Plaintiff consistently uses the May 11, 2004 date in its Response Brief.  This date ignores the standing problems, identified above, that limit Plaintiff's available recovery to damages for infringement occurring after March 29, 2010.

[11] Plaintiff presents evidence in support of its proposition that some of SAP's customers continue to use the infringing circuit arrangement.  Specifically, Plaintiff's damages expert, Walter Bractic, opined that "SAP's customers that purchased the Accused Products prior to May 11, 2004, six years prior to the filing of the complaint in this matter, continue to possess the covered circuit arrangement."  (Pl.'s Resp. Opp'n Mot. Summ. J., Ex. 2 ("Bractic Expert Report"), ¶ 43.)  Further, Mr. Bractic noted his understanding, based on several cited documents and depositions, that Pepsi, which initially signed a license in 1998, and John Deere, which initially signed a license in 2007, continued to infringe the '953 patent after March 29, 2010. (Pl.'s Resp. Opp'n Mot. Summ. J., Ex. 1 ("Bractic Supplemental Report"), ¶ 38 n.65.) Defendant produces no contrary evidence to show that none of the customers who used the infringing circuit arrangement no longer use it today.  As such, Plaintiff's evidence is sufficient to establish—for summary judgment purposes—that at least some customers of SAP continue to use the infringing products.  To the extent Defendant contends that certain customers who originally purchased and used the infringing circuit arrangement took it down prior to March 29, 2010, this remains an issue of fact for the jury.

infringer for "actively and knowingly aiding and abetting another's direct infringement." C.R. Bard, Inc. v. Advanced Cardiovascular Sys., 911 F.2d 670, 675 (Fed. Cir. 1990) (citing Water Techs. Corp. v. Calco, Ltd., 850 F.2d 660, 669 (Fed. Cir. 1998)). "[I]nducement of infringement[, however,] requires the *commission* of an affirmative act." Beverly Hills Fan, 21 F.3d at 1569; see also MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp., 420 F.3d 1369, 1379 (Fed. Cir. 2005) ("In particular, active inducement requires 'active steps taken to encourage direct infringement.'") (quoting Metro-Goldwyn-Mayer Studios, Inc. v. Grokster Ltd., 545 U.S. 913 (2005)). Further, "inducement requires evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities." DSU Med., 471 F.3d at 1306. As such, SAP's acts of simply selling the Accused Products to its customers with knowledge that the customers would continue to use them do not constitute the requisite affirmative acts required for inducement. Rather, Plaintiff must identify affirmative acts by SAP after March 29, 2010, directed to encouraging their customer's continued infringement.[12]

Plaintiff's second argument stands on less tenuous grounds. It contends that SAP continued to engage in inducing activity after the sale and set up of the infringing circuit arrangement. As noted by the Federal Circuit, the list of potentially infringing acts is quite

---

[12] At several points in its brief, CSB seems to suggest that it is suing not for continuing acts, but for continuing injury. As noted by the Federal Circuit, however, infringement harms only the owner of the patent at the time of the infringing acts. Minco, Inc., 95 F.3d at 1117. To the extent CSB was not the owner of the '953 Patent at the time of the infringing acts, it could not have been injured. The mere fact that it feels the financial impact of Defendant's alleged previous infringement is irrelevant. Rather, CSB must show that from March 29, 2010, when it first became the owner of the '953 Patent, there were infringing acts that resulted in injury.

broad:

> Of course inducement has connotations of *active steps knowingly taken*—knowingly at least in the sense of purposeful, intentional as distinguished from accidental or inadvertent. But with that qualifying approach, the term is as broad as the range of actions by which one in fact causes, or urges, or encourages, or aids another to infringe a patent.

Tegal Corp. v. Tokyo Electron Co., Ltd., 248 F.3d 1376, 1378–79 (Fed. Cir. 2001) (quoting Fromberg, Inc. v. Thornhill, 315 F.2d 407, 411 (5th Cir. 1963) (emphasis added)).  Courts have found the range of infringing acts to include actions such as support services and repair.  See, e.g., Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings, 370 F.3d 1354, 1365 (Fed. Cir. 2004) (finding active inducement of infringement based on defendant's publications describing and promoting use of a patented method); Nuance Commc'ns Inc. v. Tellme Networks Inc., 707 F. Supp. 2d 472, 486 (D. Del. 2010) (holding that provision of support services to customers in use of voice recognition system could be deemed to "perpetuate[] the infringing use") (quotations omitted); epicRealm, Licensing, LLC v. Autoflex Leasing, Inc., 492 F. Supp. 2d 608, 634–35 (E.D. Tex. 2007) (finding active inducement by providing instructions describing how to engage in an infringing use); Symbol Techs., Inc. v. Metrologic Instruments, Inc., 771 F. Supp. 1390, 1405 (D.N.J. 1991) (finding that acts of repair and maintenance are included among the list of affirmative acts which may lead to liability for inducement; and further noting that "conduct including licensing, repair and maintenance, instruction and advertising, design and assisting in manufacture have been sufficient to hold one liable for including infringement under § 271(b)").

Plaintiff enumerates several actions by SAP that it asserts constitute inducement to its customers to infringe on the '953 Patent.  For example, it contends that SAP provided

maintenance for all of its software, including SAPphone and ICI. (Pl.'s Resp. Opp'n Mot. Summ. J., Ex. 21, Dep. of George Trammel ("Trammel Dep."), 37:14–39:11, Aug. 12, 2011.) Such maintenance payments by customers, which start at 17% of the contract price, are a large revenue maker for SAP. (Pl.'s Dep. Exhs. 77, 88.) Expert witness Mr. Bractic opined that:

> SAP AG generated worldwide software support and maintenance revenues ranging from approximately $912.0 million to $8.1 billion per year from 1998 through 2010 for a total of $50.2 billion in software support and maintenance revenues during that period. Approximately $330 million to $2.1 billion per year of software support and maintenance revenues were estimated to come from sales within the United States from 1998 through 2010 for a total of $13.3 billion of software support and maintenance revenues. This accounted for 30% to 64% of all software and software related revenues during this time period.

(Bractic Expert Report ¶ 82.) Further, Defendant's own representative testified that "the majority of [SAP's] customers sign up for maintenance." (Trammel Dep. 39:6–11.) In addition, deposition testimony reveals that SAP provided ongoing support, expertise, and "workarounds" or code corrections for customers who experienced problems with use of the ICI or SAPphone. (See Pl.'s Resp. Opp'n Mot. Summ. J., Ex. 23, Dep. of Joaquin Garcia Fink ("Fink Dep.") 39:4–19, July 29, 2011; id., Ex. 24, Dep. of Satit Nuchitsiripattara ("Nuchitsiripattara Dep.") 80:5–23, 109:21–25, July 28, 2011; id., Ex. 25, Dep. of Michael Petrosh ("Petrosh Dep."), 62:17–63:9, Aug. 10, 2011.) SAP maintained websites containing various SAP "notes" and other information to aid customers with problems. (Pl.'s Resp. Opp'n Mot. Summ. J., Pl.'s Dep. Ex. 37.) Finally, SAP's standard maintenance provided twenty-four hour assistance, software upgrades when new major versions of the software came out, and "Proactive Remote Services"

to prevent problems.[13] (Petrosh Dep. 75:12–23; Pl.'s Resp. Opp'n Mot. Summ. J. 77.)  All of these services were purportedly provided well after SAP had notice of the potential infringement.

Defendant does not attempt to rebut this evidence by any citation to conflicting evidence or factually analogous case law.  Rather, it makes a single, conclusory argument, as follows:

> CSB's reliance on general evidence of SAP's maintenance and customer support also fails to raise a genuine issue of material fact.  CSB offers nothing demonstrating that this activity induced any SAP customer to infringe the '953 patent.  There is no evidence that ties the general maintenance and support to any use of the accused software in an allegedly infringing manner.  Put another way, CSB does not point to *any* specific maintenance or customer support activity by SAP relating to *any* customer's use of the accused software products that allegedly directly infringed the '953 patent during the relevant six-year time period.

(Def.'s Reply Br. 5 (emphasis in original).)  This bald argument[14] fails to refute the reasonable inferences that may be drawn from Plaintiff's evidence.  Plaintiff has offered testimony and documents to show that Defendant encouraged the infringement by its customers by supporting their continued use of the infringing product, suggesting upgrades to the software, and providing

---

[13] In its "background" statement, Plaintiff includes a discussion of SAP's untimely production of damage-related documents.  Specifically, CSB now argues that Defendant failed to produce accurate and complete records, meaning that damages must be estimated on the best available evidence with all doubts being resolved against Defendant.  It goes on to conclude that where it is impossible to make a mathematical or approximate apportionment between infringing and non-infringing times, the infringer must bear the entire risk.
    The Court declines to address this argument. Had Defendant truly been delinquent in its document production, the onus fell on Plaintiff to bring a timely motion to compel.  The summary judgment stage is not the appropriate juncture to address prior discovery disputes.  To the extent such alleged failures by Defendant affect Plaintiff's ability to present its case at trial, its argument is best reserved for a motion in limine.

[14] Defendant offers several other cursory arguments, developed by way of footnotes, addressing the quality of Plaintiff's evidence.  Given the already scant attention the parties lend to their briefs in general, the Court declines to do Defendant's work of researching and developing points raised in a mere sentence or two.  (See Def.'s Reply Br. 5–6, n.3 & 4.)

ongoing maintenance and repair. Such evidence allows the reasonable inference that Defendant's actions were done with the intent of encouraging ongoing infringement by its customers. At minimum, a genuine issue of material fact remains, thereby requiring that summary judgment on this point be denied. Should Plaintiff ultimately be unable to prove either affirmative actions taken to induce infringement or recoverable damages within the relevant time period, Defendant will be able to avoid liability for such damages at trial. Based on the evidence currently on the record, however, a reasonable jury could find that such damages exist.[15]

## IV.   CONCLUSION

By its own words, Plaintiff's damage methodology seeks to "capture all ongoing infringing activity regardless of the date of sale of the license for SAPphone or ICI" on the premise that patent infringement is a continuing tort which results in continuing injury. (Pl.'s Resp. Opp'n Mot. Summ. J. 10–11.) This methodology, however, blatantly disregards the fundamental principle that one seeking monetary damages for patent infringement must have

---

[15] Defendant cites to National Presto Industries, Inc. v. West Bend Co., 76 F.3d 1185, 1195-96 (Fed. Cir. 1996) for the proposition that CSB cannot recover from SAP for sales that occurred at a time when CSB was not legally entitled to damages for infringement, even if there is ongoing infringement by SAP's customers and SAP induces that infringement. National Presto, however, is completely distinguishable and, thus, entirely inapposite. In that case, the defendant placed later-infringing items into the chain of commerce *before the patent issued*. Id. at 1196. Accordingly, any inducement to infringe by the defendant to its customers occurred prior to any infringement. Id. The court dismissed the claim, holding that "the general rule is that inducement of infringement under § 271(b) does not lie when the acts of inducement occurred before there existed a patent to be infringed." Id. at 1196.
   This concern is not present in this case. At the time that SAP developed and marketed the Accused Products, the '953 Patent had long been issued. Thus, to the extent the Accused Products are deemed to infringe on the '953 Patent, any sales or marketing of those products by SAP constituted direct infringement. The current alleged inducement to infringement thus occurred *after* the direct infringement by SAP and well after the issuance of the patent.

held legal title to the patent at the time of the infringement.  <u>Messagephone</u>, 2000 WL 1141046, at *4.  Plaintiff has only owned the patent since March 29, 2010, and was never assigned any right to sue for past infringement.  As such, any infringement prior to that date—while actionable by the owner of the '953 Patent at the time—is simply not actionable by Plaintiff under principles of standing.  In turn, to the extent Plaintiff can succeed on its claims for infringement, its damage award must be limited to those damages resulting from acts of infringement committed by Defendant from March 29, 2010 onward.  Although Plaintiff's evidence allows its remaining damages claim to survive summary judgment, the trial burden now falls upon Plaintiff to prove that, during that time frame, SAP took affirmative steps to induce continued direct infringement by SAP's customers.

  An appropriate order follows.